UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND

CIVIL ACTION NO. 0:05-CV-236-HRW

NANCY OSBORNE, PLAINTIFF,

V.

WESTERN & SOUTHERN LIFE
INSURANCE CO. FLEXIBLE
BENEFITS PLAN, DEFENDANT.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon cross motions for judgment on the administrative record. [Docket Nos. 23, 24, 25]. The matter is fully briefed and ready for review. For the reasons which follow, the Court will sustain the Motion of Western Southern and affirm the decision of the Benefits Committee.

### I. Factual and Procedural Background

Nancy Osborne was employed by Western Southern as a sales representative, beginning April 15, 1996. On January 19, 2004, Ms. Osborne began a long-term absence from her employment due to major depression. (Record at 66, 128, 231). At that time, she was under the care of Dr. Michelle Bagley, DO. In March 2004, Dr. Bagley referred Plaintiff to Dr. David Sipple at Regional Psychotherapy Services, Inc. (Record at 71). Dr. Sipple's office conducted an an assessment of Plaintiff's pyschological impairment on March 1, 2004 and concluded that Ms. Osborne had a

moderate impairment. (Record at 73).

At first Plaintiff treated with Dr. Sipple's office every two to three weeks (Record 74-75, 78, 80). After an office visit on June 22, 2004, the therapy sessions were decreased to a quarterly basis. (Record 82). On May 4, 2004, Dr. Jack Borders at Regional Pyschotherapy Services provided Western Southern with an estimated return to work date of January 1, 2005 (Record at 79).

On July 21, 2004, Dr. Sipple provided a letter to the company addressing Osborne's ability to return to work. He noted that she was being treated for major depression, recurrent, severe in nature and unable to return to work at that time. He advised that the treatment plan would include "frequent psychotherapeutic encounters and medication management." (Record at 61).

Plaintiff began receiving Short Term Disability benefits, retroactively applied to January 26, 2004. On July 28, 2004, Western Southern filled out a "Disability evaluation" on the Plaintiff. (Record at 231). Western Southern also requested Ms. Osborne undergo a psychiatric independent medical examination (IME) in connection with her application for Long Term Disability Benefits. (Record at 54-55). The exam took place on August 25, 2004 at Phoenix Psychiatry Services. The results of the exam showed that Ms. Osborne was suffering from major depressive disorder, severe, with psychotic features, dynamic disorder and bi-polar disorder. The recommended

2

treatment plan provided that Ms. Osborne should "continue to follow with Dr. Borders for medication management and pyschotherapy. May benefit from an antipsychotic. Due to her current symptoms Nancy would have difficulty maintaining gainful employment at this time but would hopefully be able to return to work after a short time." (Record at 57). A letter to the benefits department indicated that with the right combination of medication and psychotherapy, Ms. Osborne should have been able to return to work after approximately six months. (Record at 60).

On September 24, 2004, the benefits department advised Ms. Osborne that her application for long term disability benefits had been approved, effective July 24, 2004. The letter additionally stated that the claim for benefits would be periodically reviewed and that Ms. Osborne could be asked to provide evidence or assist the Company in obtaining evidence regarding the continuance of the disability. (Record 182-83).

Since Ms. Osborne's projected return to work date was estimated as January 2005, the benefits department sent her a letter on January 19, 2005 requesting that she submit information to assist in determining the status of her claim for disability benefits. (Record 85). On January 29, 2005, Osborne completed a long term disability questionnaire. (Record 47). She stated that she was prevented from working because of "depression–suicidal." Ms. Osborne listed Dr. Bagley and

3

"David RPS" as her physicians. (Record 47). In response to a question asking whether she was currently receiving therapy or treatments, Ms. Osborne checked the box marked "No." (Record 47). She additionally stated in the questionnaire that she had not seen a physician since September 2004 and was not receiving any therapy, treatment or special care for her condition. (Record 47).

Following Ms. Osborne's report that she was not receiving treatment, the benefits department sent letters to Dr. Bagley and to Regional Psychotherapy Services to request reports of Ms. Osborne's current diagnoses, medications and treatment programs, limitations on physical activities, and potential for return to work in any capacity. (Record 48, 83, 84). Dr. Bagley responded that she had not seen Ms. Osborne since March 4, 2004. (Record 5). Regional Psychotherapy Services submitted a response stating that Ms. Osborne "is not under our current care and treatment." (Record 48). This response was handwritten on the letter from the benefits department and unsigned.

On March 18, 2005, Ms. Osborne was advised by letter that her benefits were being discontinued by the Plan. (Record 30). The letter stated that under Section 7 of the Plan, no benefits were payable for any period during which a participant was not under the regular care and attendance of a physician. The letter cited the information received from her physicians as establishing that Ms. Osborne was not

4

under care of a physician. (Record 30). Additionally, the letter advised Ms. Osborne of her right to appeal the decision, but it cautioned to submit all information in support of the claim, as the decision of the appeal committee would be final. (Record 30).

Ms. Osborne advised the plan of her intention to appeal the decision by an undated written letter. (Record 35). In the letter, she stated that she was "not aware [she] needed to see the doctor if nothing changes." (Record 35). Ms. Osborne also submitted a letter from Regional Psychotherapy Services dated March 22, 2005. In the letter, Dr. Sipple stated that Osborne was being treated for major depression, recurrent and severe in nature. The letter stated that she was last seen in the office on March 21, 2005 (after the benefits were terminated on March 18), and that the professional opinion was that Ms. Osborne was unable to hold down any gainful employment at that time. (Record 36). The letter did not contain any reference to or explanation of the time gap in Ms. Osborne's treatment. (Record 36). Likewise, the letter did not claim that the prior information submitted to the benefits department stating that Ms. Osborne was not under current care (Record 48) was in error. For instance, the letter did not state that the March 21, 2005 visit had been scheduled prior to termination of benefits. (Record 36).

By letter dated May 3, 2005, Western Southern advised Ms. Osborne that her

5

appeal was denied. (Record 185). The letter stated that based upon the submitted documentation, she had not been under the regular care and attendance of a physician as required by Section 7 of the plan. (Record 185). The letter indicates that the doctors notes were taken into consideration. (Record 185). An Appeal Summary sheet indicates all relevant facts taken into account on appeal, including Ms. Osborne's appeal letter and the March 22 letter from Dr. Sipple. (Record 34). The notation on the Appeal Summary reads "deny... no documentation that member is long term disabled. 4/18/05..." (Record 34).

The Western Southern Life Insurance Company Flexible Benefits Plan is a self-insured plan, the administration of which is vested in the Benefits Committee. (Record 286, 373). The members of the Benefits Committee are appointed by the Board of Directors of the Company. (Record 373).

Section 2.34 of the Plan defines "Long Term Disability of Long Term Disabled" as follows:

> (a) With respect to a Covered Employee who is a Field Representative of District Office Clerical Employee, Long Term Disability or Long Term Disabled shall mean the complete and continuous incapacity of such Covered Employee to engage in any and every occupation, business or employment, including self-employment, for wages, compensation or profit.
>
> (b) With respect to a Home Office or Subsidiary Covered

6

>Employee, Long Term Disability or Long Term Disabled shall mean for the first 24 months after the expiration of Temporary Disability, the incapacity of such Covered Employee to perform all of the material duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience. After the expiration of the first 24 months of Long Term Disability, Long Term Disability or Long Term Disabled shall mean the complete and continuous incapacity of the Covered Employee, to engage in any and every occupation, business or employment, including self-employment, for wages, compensation or profit.

(Record 292).

Section 7.6 of the Plan identifies limitations on a participant's eligibility to recover Long Term Disability benefits under the Plan. (Record 323). More specifically, this section provides that "[n]o benefits shall be paid for any period of Long Term Disability... (c) during which the Covered Employee is not under the regular care and attendance of a Physician." (Record 324).

Section 7.2(a) provides that "[t]he determination of whether a Covered employee has incurred a Long Term Disability and has complied with all of the requirements for receiving Long Term Disability Benefits shall be made by the Benefits Committee in its sole discretion." (Record 321). Additionally, Section 15.4 vests authority in the Benefits Committee as follows:

>The Benefits Committee shall have the discretionary authority to determine eligibility for benefits and to

7

> construe the terms of the Plan. Benefits under this Plan shall be paid only if the Benefits Committee, as Plan Administrator, decides in its discretion that the applicant is entitled to them. The Benefits Committee shall have such other discretionary authority and powers as may be necessary to enable it to discharge its duties and responsibilities under the Plan as Plan Administrator and Named Fiduciary, including, but not limited to the power:
>
> (a) to interpret and construe the Plan, including but not limited to the power to determine all questions with regard to employment, eligibility, service, earnings, coverage, benefits, and such factual matters including, but not limited to, date of birth and marital status, and similarly related matters for the purpose of the Plan, and the Benefits Committee's determination of all questions arising under the Plan shall be conclusive upon all persons, the Employer and other interested parties.

(Record 373-74).

Finally, Section 14.13 of the Plan provides a limitations period for filing a civil action to challenge an adverse benefit determination. That section provides that "[n]otwithstanding any other provision of the Plan to the contrary, no action, including but not limited to administrative, claim or suit relating to or arising out of the Plan may be commenced or maintained more than six months after the later of the Employer's initial claim decision or the Employer's decision on review." (Record 372).

8

## II. Standard of Review

Where, as in this case, the plan contains a clear grant of discretion to the administrator to make benefits determinations and construe the terms of the plan, the court must apply the arbitrary and capricious standard of review. *See, e.g., Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998).

Plaintiff argues that this arbitrary and capricious standard of review should be modified in this case however, based on the fact that the Plan is self-funded by the employer and that the members of the Benefits Committee are appointed by the Western Southern Board of Directors. Plaintiff urges that the standard should be less deferential than arbitrary and capricious due to this possible "conflict of interest." In support of this position, Plaintiff cites *University Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839 (6th Cir. 2000). However, *University Hospital* does not hold that arbitrary and capricious review is inapplicable in cases such as this where the plan is self-funded and self-administered by the employer. The standard of review does not change. *University Hospital* merely holds that a potential conflict of interest in such situations is a factor to be taken into account when applying the standard. *See id.* at 846.

Sixth Circuit law is clear on the point that the fact that a plan is administered and funded by the employer is "significant only to the extent that any possible

9

conflict of interest should be taken into account as a factor in determining whether the committee's decision was arbitrary and capricious." *Davis v. Kentucky Fin. Co. Ret. Plan*, 887 F.2d 689, 694 (6th Cir. 1989). Thus, the proper standard of review in this matter is arbitrary and capricious.

## III. Discussion

### A. Statute of Limitations

Western Southern argues that this action is barred by the applicable limitations period set forth in the Plan itself. Plaintiff challenges the enforceability of the limitations period based on the application of K.R.S. § 304.14-37. That statute provides that:

> No conditions, stipulations or agreements in a contract of insurance shall deprive the courts of this state of jurisdiction of actions against foreign insurers, or limit the time for commencing actions against such insurers to a period of less than one (1) year from the time when the cause of action accrues.

K.R.S. § 304.14-370.

Plaintiff submits that this state statute is saved from ERISA preemption under the "insurance savings clause" of § 514(b)(2)(A). In support, Plaintiff cites *Kentucky Assn. of Health Plans, Inc. v. Miller*, 538 U.S. 329, 123 S.Ct. 1471 (2003). In *Miller*, the United States Supreme Court held certain provisions of the Kentucky Health Care Reform Act saved from ERISA preemption under the savings clause. In so holding,

10

the Court announced the test for determining if a state law is saved under the insurance savings clause. First, the state law must be specifically directed toward entities engaged in insurance. 538 U.S. at 342. Second, the state law must substantially affect the risk pooling arrangement between the insurer and the insured. *Id.* Plaintiff seems to conclude that K.R.S. 304.14-370 meets the *Miller* test without actually addressing the specific requirements. At first blush, the Kentucky statute cited by Plaintiff appears to fall under the *Miller* test. However, whether the Kentucky statute actually applies in the ERISA context is unclear and in any event, this case can and will be decided without endeavoring to answer these questions.

## B. The Plan's Decision

Plaintiff complains that the Benefits Committee's denial of her appeal for failure to meet the regular care and attendance requirement was arbitrary and capricious because the Committee "turned a blind eye" to the March 22, 2005 letter from Dr. Sipple which stated that Ms. Osborne was currently under his care. It is clear from the record that, to the contrary, the Benefits Committee did acknowledge and consider this letter. That they did not find it persuasive does not mean it was ignored. The notice of the denial of her appeal clearly indicates that the letter was considered, but the Committee had to weigh it against the other evidence before it.

Plaintiff also implies that the Committee was not entitled to rely on the prior

11

information submitted by Dr. Sipple's office (in February, 2005) which stated that Ms. Osborne was not under their care because the Committee did not inquire about this note or who in Dr. Sipple's office actually wrote it. Plaintiff, however, does not dispute the fact that the note came from somewhere within Dr. Sipple's office. She simply complains that the Benefits Committee should have inquired as to which member of his staff it came from.

It should be emphasized that the March 22 letter from Dr. Sipple came *after* Osborne was notified of the initial decision to terminate her benefits, as did the March 21 visit in Sipple's office. Ms. Osborne provided the Benefit Committee with no evidence that the March 21 visit had been scheduled before the notice of termination and likewise no evidence that the previous information from Sipple's office indicating that she was not currently being treated was in error.

Defendant thus submits that based on the evidence before the Committee and the suspicious timing of the March 21 visit and March 22 letter, the decision to deny Osborne's appeal was supported by a reasoned explanation–ie, that there had been no appointment scheduled with Dr. Sipple until after she received notice of termination. This Court agrees.

The evidence in the record is clear that prior to that post-termination office visit, Ms. Osborne had not been seen by Dr. Sipple or any doctor since September of

12

2004. It is also crystal clear that Ms. Osborne herself represented to the Benefits Committee in the January 2005 questionnaire that she was not receiving therapy or treatments. Likewise, each of Ms. Osborne's physicians' offices corroborated this fact when questioned by the Benefits Committee. Under these circumstances, this Court cannot say the Committee's decision was arbitrary and capricious.

### C. Temporary or Permanent Termination

Whether the Committee's decision to terminate Plaintiff's benefits on a permanent basis may be quite another question entirely. Plaintiff argues that under the language of Plan Section 7.63, while the Benefits Committee may deny benefits ***during the period*** a member is not under the regular care of a physician, this is not the same as terminating the benefits altogether and permanently. The relevant provision provides that "[n]o benefits shall be paid for any period of Long Term Disability... (c) during which the Covered Employee is not under the regular care and attendance of a Physician." (Record 324). Plaintiff therefore contends that at the very least, she should be deprived of benefits only for that period from September 2004 to March 2005 during which she was not under a physician's care, but that to discontinue altogether is an arbitrary and capricious way to read the provision.

Defendant counters that Plaintiff's contention reads the regular care requirement in isolation rather than giving effect to the provisions of the plan as a

13

whole. The regular care requirement appears in the section of the Plan governing receipt of Long Term Disability Benefits. Sections 7.2(a) and (b) provide that whether an employee "has complied with all of the requirements for receiving Long Term Disability Benefits shall be made by the Benefit Committee in its sole discretion." (Record 321-22). Section 7.1 provides that the long-term disability benefits provided under the Plan are subject to the limitations prescribed in Section 7.6 which include, but are not limited to, being under the regular care of a physician, requiring cooperation in gathering information that would support a finding of disability and exclusions for self-inflicted injuries or injuries resulting from a pre-existing condition. Defendant claims that it was a proper exercise of discretion to thus conclude that Ms. Osborne's failure to meet the regular care requirement disqualified her from eligibility generally.

In support, Defendant cites *Rowan v. Unum Life Ins. Co.*, 119 F.3d 433 (6th Cir. 1997). The relevant facts of *Rowan* are similar to this case. The Plan administrator had determined that the *Rowan* plaintiff was not eligible for Long-Term Disability benefits because she failed the plan's regular care requirement. The policy in that case provided that "[t]he insured will be paid for the period of disability if the insured gives the Company proof of continued. . . regular attendance of a physician." However, failure to meet that requirement was not explicitly listed as a basis on

14

which benefits would be terminated altogether.

The *Rowan* plaintiff complained that the policy was ambiguous as to whether regular attendance was required as a precondition of eligibility for receipt of benefits under the provisions of the policy. The Sixth Circuit disagreed, stating:
> Although it is true that this requirement is not included in either the definition of disability or the subsection setting forth the criteria for termination of eligibility, the requirement is clearly and unambiguously stated at the beginning of the benefits section which included the termination sub-section. The statement in the termination section that 'benefits would cease on the earliest of the dates listed in that subsection does not literally preclude cessation at an earlier date when the claimant fails to provide the required proof of disability or regular care of a physician. Read as a whole, the policy is neither unclear nor misleading and cannot reasonably be read not to require the regular attendance of a physician.

119 F.3d at 437-38.

Western Southern argues that like the *Rowan* case, Ms. Osborne's plan as a whole cannot be reasonably read any way other than to require continuing proof of disability and regular care of a physician. The facts of *Rowan* are not identical to the circumstances of this case. In particular, there is no mention in *Rowan* of policy language describing a termination of benefits "for a period" as in the Plan section relied upon to terminate Ms. Osborne's benefits. Additionally, Ms. Osborne has not argued that the policy was ambiguous as to whether regular care was required. Rather, she relied upon the plain language of the policy that provides that no benefits

15

will be paid of "any period" of failure of this requirement. In short, this Court can see no reason why Ms. Osborne could not re-apply for disability benefits, assuming that she has continued to be under the regular care of a physician since her termination. The matter of permanent termination or termination for a period remains a live question for the Sixth Circuit to resolve if and when the opportunity is presented.

## IV. Conclusion

For the reasons discussed above, the Court will affirm the decision of the Benefits Committee. A separate judgment consistent with this opinion shall enter forthwith.

This __5__ day of __July__, 2007.

_____
Henry R. Wilhoit, Jr.
Senior U.S. District Judge